## 600 Grant Street Associates Limited Partnership v. City of Pittsburgh

C.P. of Allegheny County, no. GD01-1211.

*David R. Cohen* and *Hollee Schwartz Temple,* for plaintiffs.

*Ronald H. Pferdehirt,* for defendant City of Pittsburgh.

*Ira Weiss,* for defendant School District of Pittsburgh.

*Terrence McVerry* and *John A. Mulroy,* for defendant County of Allegheny.

WETTICK JR., *J.,* February 5, 2001—Plaintiffs are property owners who pay real estate taxes to the County of Allegheny, the City of Pittsburgh, and the School District of Pittsburgh. For 2001, they will owe property taxes based on new assessments and an established predetermined ratio that has been increased from 25 percent to

100 percent. Plaintiffs request that I rule that the millage rates set by the county, the city, and the school district are excessive, that I prohibit these taxing bodies from setting millage rates for the year 2001 that will result in these taxing bodies collecting property tax revenue for the year 2001 in an amount in excess of (1) 105 percent of the total property revenue received in 2000 plus (2) additional revenue from newly constructed buildings or on increased valuations based on new improvements made to existing structures.

Plaintiffs rely on Act no. 146, adopted on December 21, 1998, 16 P.S. §4980.2 (Supp. 2000), which reads as follows:[1]

"*Limits on counties of the second class.* Notwithstanding any provisions of the Act of June 21, 1939 (P.L. 626, no. 294), referred to as the Second-Class County Assessment Law, to the contrary, when a county of the second class makes its annual reassessment at values based upon an established predetermined ratio as required by law or when a county of the second class changes its established predetermined ratio, each political subdivision which hereafter levies its real estate taxes on that revised assessment or valuation shall for that year reduce its tax rate, if necessary, for the purpose of having the total amount of property tax revenue received exclusively as a result of the reassessment or change in ratio not to ex-

---

1. In the legal papers which they have filed, plaintiffs refer to Act 146 as the "taxpayer protection statute." This is plaintiffs' characterization of the legislation; the legislature did not identify this legislation in this fashion.

ceed 105 percent of the total amount of property tax revenue received in the preceding year, notwithstanding the increased valuations of properties under the annual reassessment system. For the purpose of determining the total amount of revenue received exclusively as a result of the reassessment or change in ratio for the year, the amount to be levied on newly constructed buildings or structures or on increased valuations based on new improvements made to existing structures shall not be considered."

At the time Act 146 was enacted, Allegheny County was under a court order to complete a county-wide reassessment. The court order provided for the reassessment to be completed by the year 2000 for use in the tax year 2001.

At the time Act 146 was enacted, Allegheny County's predetermined ratio was 25 percent. However, its common-level ratio was approximately 20 percent. It was anticipated that the Board of Property Assessment, Appeals and Review would increase the predetermined ratio to 100 percent for year 2001.

The two events described in the above paragraphs occurred. The county-wide reassessment was completed in the year 2000 for use in the tax year 2001. The 25 percent predetermined ratio was abolished; for the year 2001, properties are assessed at 100 percent of their fair market values.

Act 146 applies in any year in which a political subdivision levies its real estate taxes on a revised annual assessment of a county of the second class or when a county

of the second class changes its established predetermined ratio. Both conditions occurred for the year 2001.[2]

All parties agree that Act 146 was enacted to prevent taxing bodies from increasing taxes solely because property values were increased as the result of a reassessment and/or an increased established predetermined ratio.

Act 146 was sponsored by then State Senator Melissa Hart who was quoted in an article appearing in the November 19, 1998 *Pittsburgh Post-Gazette* (Frank Reeves, "Property tax vote expected next week") as follows:

"Those of us who live in Allegheny County can see our property taxes increase without local officials voting to do so, because property taxes rise automatically with high reassessments," Hart said. "This bill will ensure that local property taxes won't increase more than the inflation rate—unless officials vote to do so."

By the year 2000, the county's common-level ratio was less than 20 percent, so if property was valued in 2001 at 100 percent, for the typical taxing body in Allegheny County, assessed property values would increase

---

2. It is my understanding that the countywide reassessment that was completed for use in year 2001 is based on the design and use of a computer program which will permit the county's assessment board— primarily on the basis of sales information for sales throughout Allegheny County in prior years—to reassess at any time the entire county and that it is the assessment board's intent to revise assessments countywide each year (for example, the assessed values for the 2002 tax year will be based on 2001 fair market values). If the county reassesses each property each year in this fashion, possibly Act 146 must be complied with on an annual basis. I do not address this issue in this litigation.

between 2000 and 2001 by more than 500 percent. Thus, if this typical taxing body reduced its millage from 10 mills to three mills, the property owners might believe their taxes had been reduced. However, since there was more than a five-fold increase in property values attributable to the reassessment and the change in the predetermined ratio, taxes would actually have increased by 50 percent. (A small portion of this increase in property values within the taxing body within the past year would be attributable to new construction or inflation.[3]) Consequently, under Act 146 if property values of existing property increase by 500 percent from 2000 to 2001, the legislature requires the municipality to reduce taxes to 2.1 mills and not to 3 mills:

| Year | Tax | Total Assessment Value | Revenue |
|------|-----|------------------------|---------|
| 2000 | 10 Mills | $ 2,000,000 | $20,000 |
| 2001 | 2.1 Mills | $10,000,000 | $21,000 |
| 2002 | 3 Mills | $10,000,000 | $30,000 |

Plaintiff property owners claim that the taxes of the city, county, and school district should be reduced because the tax rates that these taxing bodies have adopted will produce revenue in 2001 based on 2001 taxes in excess of 105 percent of the revenue that these taxing bodies collected in 2000 from their 2000 taxes. The taxing bodies contend that they are in compliance with Act

---

3. Ordinarily, tax increases that are based on growth and inflation are not considered "windfall" taxes. For example, the Commonwealth of Pennsylvania's revenue from its income tax increases each year even though the tax rate remains the same because of increased earnings (pay raises) and additional employment compared to the prior year.

146 on the basis of the evidence which they submitted at a January 29, 2001 hearing and their construction of Act 146.

## I.

I initially consider the property owners' claim that Allegheny County's millage rate for the year 2001 (4.72 mills) violates Act 146.[4] Allegheny County's governing body did not vote to raise taxes.

In order to determine whether a taxing body's millage in 2001 is likely to produce revenue in excess of that permitted by Act 146, I must calculate the taxing body's actual 2000 revenue and its likely revenue for 2001. The 2001 revenue cannot exceed 105 percent of the 2000 revenue (excluding new construction).

At the January 29, 2001 hearing, Allegheny County calculated its 2000 revenues from real estate taxes to include the money that the county actually received from its 2000 real estate taxes in 2000: $229,780,277.

The county then added revenues of $10,374,510 that are identified in Table One. While these are revenues related to real estate taxes and were received in 2000, for the most part they relate to the payment in 2000 of delinquent taxes (*i.e.,* taxes owed prior to January 1, 2000).

---

4. While I refer to Act 146 in this opinion and order of court, I am not deciding whether Act 146 applies to the county because the Home Rule Charter of Allegheny County and its Administrative Code contain very similar language.

Table One

| Sub-Object Code | Description | 2000 Preliminary |
|---|---|---|
| 0012 | Real Estate Delinquent Collections | $6,209,815 |
| 0013 | Real Estate Liened Collections | 1,647,558 |
| 0014 | Interest Delinquent Real Estate Taxes | 400,501 |
| 0015 | Penalty Delinquent Real Estate Taxes | 406,624 |
| 0016 | Interest Liened Real Estate Taxes | 556,773 |
| 0017 | Penalty Liened Real Estate Taxes | 112,536 |
| 0018 | Act 602—Current Year Delinquent | 210,502 |
| 0037 | In Lieu of Taxes—Tax Exempt Properties | 830,201 |
| | Total Non-Current | $10,374,510 |

However, for purposes of Act 146, the county included for tax year 2001 only the taxes that it expects to receive in 2001 from its year 2001 taxes. It did not include any money that it expects to receive in year 2001 from taxes imposed in years prior to year 2001.

The language of Act 146 refers to property tax revenue "received exclusively as a result of the reassessment or change in ratio." The county contends that the inclusion of this clause permits it to (1) include money received in year 2000 from the late payments of taxes due in prior years and (2) to exclude these payments in year 2001. The property owners contend that the language of Act 146 does not support a reading of Act 146 in this fashion.

Possibly, there is more than one way to read the words of Act 146. However, this legislation should be read to accomplish its obvious legislative purpose of keeping a

taxing body from collecting more revenue (except for a five percent inflation allowance and revenue from new construction) in the year following a reassessment or change in ratio than it received from its taxes in the prior year without publicly announcing and voting for a tax increase. When a taxing body is comparing revenues received in the prior year with anticipated revenues in the present year, under recognized accounting principles it must include the same revenue sources for both years. Act 146 is a guarantee to the taxpayers that they will not be paying a hidden tax increase (after excluding a five percent inflation adjustment and new construction). If this legislation is construed to permit the use of methods of accounting that do not permit an accurate comparison of revenue in the year of the reassessment with revenue in the prior year, Act 146 will be enabling rather than preventing hidden tax increases. This is not what the legislature intended.

At a meeting on January 31, 2001 with counsel for the county and counsel for plaintiffs, I directed the county to prepare a comparison between year 2000 and year 2001 that did not consider, for either year, the receipt of money from delinquent taxes.

In 2000, the county would have received $242,665,376 if it had collected 100 percent of the taxes that it imposed in 2000. The county actually received $224,576,116 or 92.5 percent of the gross amount.

In 2001, the county will receive $268,593,407 if it collects 100 percent of the taxes which it has imposed in 2001. Under Act 146, the county may deduct gross receipts of $4,460,246 for new construction. The county

has also deducted $9,702,000 as refunds that will be paid in 2001 because of appeals.[5]

These adjustments produce gross revenues of $254,431,161. The county assumes the same collection rate of 92.5 percent and therefore anticipates revenues (after excluding new construction) of $235,348,824. This is an increase (after excluding new construction) of 4.8 percent. The county's tax rate complies with Act 146 if its deductions are permitted.

Plaintiffs' counsel advised me that he is not challenging the county's use of a collection rate of 92.5 percent, because this was its collection rate in 2000.

The county has a budget item of $9,702,000 for refunds to be made in 2001 because of assessment adjustments. Plaintiffs did not challenge this deduction because of the inclusion of this item as a budget item that can be used only for this purpose. The county will voluntarily agree to the issuance of a court order which will permit this budget item to be used only for refunds and for any balance to be placed in the 2002 budget in a budget item for refunds.

For these reasons, I find that the county millage complies with Act 146. My order of court governing plaintiffs' Act 146 challenge to the Allegheny County millage is the first order attached to this opinion.

## II.

I next consider the property owners' claim that the City of Pittsburgh's millage rate for year 2001 violates Act

---

5. The county assumes that the amount it will pay out in 2001 will increase because there will be many more successful appeals as a result of the countywide reassessment.

146. At this time, the city's tax rate is 31.37 mills for land and 5.44 for buildings.[6]

At the January 29, 2001 hearing, the city also calculated (1) its 2000 revenue from real estate taxes to include both the money it actually received in 2000 from its 2000 taxes and money received in 2000 for the late payment of taxes due in prior years and (2) its 2001 revenue from real estate taxes to include only money it expects to receive in 2001 from its 2001 taxes. At a meeting on January 31, 2001 with counsel for the city and for plaintiffs, I directed the city to prepare a comparison between year 2000 and year 2001 that did not consider, for either year, the receipt of money from taxes owed in prior years.

Presently, the city's books and records show the city received $110,998,081 in the year 2000 for 2000 real estate taxes. This amount may be adjusted after a final audit. If it is not adjusted, under Act 146 the city may receive in 2001, revenues of 105 percent of $110,998,081 or $116,547,798 based on 2001 taxes (excluding revenues from new construction).

As part of its response to Act 146, the operating budget for the City of Pittsburgh includes the following provision:

"Due to the uncertainties surrounding current data received from Allegheny County, a 'Taxpayers rebate and appeals trust fund' will be established. This places in reserve any revenue exceeding the 105 percent cap. Rev-

---

6. I recognize that the city may adjust its millage for year 2001. I am advised that any adjustment will not produce additional anticipated revenue.

enues exceeding the cap will either be credited or refunded to taxpayers."[7]

The city contends that since the above provision was part of its response to Act 146, I must construe this provision broadly in deciding whether the city has complied with Act 146. I agree. In order for the city to be in compliance with Act 146, I interpret this provision establishing a taxpayers rebate and appeals trust fund as follows: Any revenue from 2001 taxes (excluding new construction) in excess of 105 percent of $110,998,081 will be placed in this escrow fund. The above figure may be adjusted if the final audited 2000 revenues from 2000 taxes received in year 2000 differ from $110,998,081. Also, the above figure may be adjusted if there is an appellate court decision which construes Act 146 in a manner that differs from my interpretation of this legislation.

The city offered the following justification for creating this trust fund: The underlying purpose of Act 146 is to prevent spending in excess of 105 percent of last year's revenues unless the taxing body votes to increase taxes (*i.e.,* you cannot spend what you will not have). Because of the reassessment, there is considerable uncertainty concerning how many people will participate in the city's tax abatement programs and the amount of refunds that

---

7. A refund or a credit may not be feasible because of the administrative costs that would be incurred. I construe the last sentence to permit the city to use an Act 146 solution under which it must adjust its 2001 millage downward for 2002 to reflect the money in the trust fund. Because of my ruling covering the school district, the city could then increase millage for 2002 if, and only if, its taxing body voted to raise taxes.

will be paid in 2001. The city recognizes that some of its revenue projections and projected payments for tax refunds may be too pessimistic. However, it did not want to make projections that failed to produce the revenue that the city requires (and to which it is entitled under Act 146). Consequently, it created the trust fund as part of a "wait and see" approach.

Because the city responded to Act 146 by creating a trust fund that will prevent the city from spending more money than 105 percent of its 2000 revenue, I should not intervene unless I find with reasonable certainty that the city's millage will produce revenue in 2001 in excess of 105 percent of year 2000 revenue. I do not find that the city's millage violates Act 146.

My order of court, governing plaintiffs' Act 146 challenge to the City of Pittsburgh millage is the second order attached to this opinion.

## III.

I next consider the property owners' claim that the school district's millage rate for the year 2001 (13.92 mills) violates Act 146.

According to the school district, it initially reduced its tax rates to an amount that produced revenue of only 105 percent of the year 2000 property tax revenue (excluding new construction). Thereafter, it voted to increase real estate taxes by 20 percent. Plaintiff property owners contend that (1) Act 146 prohibits tax increases in excess of 105 percent; (2) the school district did not engage in a two-step process through which it initially reduced its tax rate and thereafter voted to increase taxes

by 20 percent; and (3) even assuming that the steps that the school district took constitute a two-step process in which it initially reduced its tax rate, the reduced tax rate produces income significantly in excess of 105 percent of the school district's property tax revenue for 2000.

In Part A, I address the first issue; I am ruling in favor of the school district.

In Part B, I address the second issue; I am ruling in favor of the school district.

In Part C, I address the third issue; I am ruling in favor of plaintiffs and ordering the school district to reduce its taxes from 13.92 mills to 13.22 mills.

### A.

The issue that I now address is whether Act 146 was intended to prevent taxing bodies from increasing their taxes by more than five percent or whether its sole purpose was to prevent increases in tax revenue in excess of five percent attributable exclusively to the reassessment/ change in ratio.

The wording of Act 146 supports the school district's position. It provides for a reduction of the tax rate "for the purpose of having the total amount of property tax revenue received *exclusively as a result of the reassessment or change in ratio* not to exceed 105 percent of the total amount of property tax revenue received in the preceding year." The final sentence of Act 146 uses the same language. It provides that taxes levied on new construction and improvements should not be considered when determining "the total amount of revenue received *exclusively as a result of the reassessment or change in*

*ratio* for the year." 16 P.S. §4980.2. (emphasis added) These emphasized words have meaning only if the legislature intended to permit the total amount of tax revenue received in the year of the reassessment/change in ratio to be more than 105 percent as a result of a tax increase. Under the construction of Act 146 proposed by plaintiffs, the words "exclusively as a result of the reassessment or change in ratio" are meaningless. If I exclude the clause "exclusively as a result of the reassessment or change in ratio," the legislation contains an absolute prohibition against any receipt of increased revenue in excess of five percent:

*"Limits on counties of the second class.* Notwithstanding any provisions of the Act of June 21, 1939 (P.L. 626, no. 294), referred to as the Second-Class County Assessment Law, to the contrary, when a county of the second class makes its annual reassessment at values based upon an established predetermined ratio as required by law or when a county of the second class changes its established predetermined ratio, each political subdivision which hereafter levies its real estate taxes on that revised assessment or valuation shall for that year reduce its tax rate, if necessary, for the purpose of having the total amount of property tax revenue received ~~exclusively as a result of the reassessment or change in ratio~~ not to exceed 105 percent of the total amount of property tax revenue received in the preceding year, notwithstanding the increased valuations of properties under the annual reassessment system. For the purpose of determining the total amount of revenue received, ~~exclusively as a result of the reassessment or change in ratio for the year~~, the amount to be levied on newly constructed buildings or

structures or on increased valuations based on new improvements made to existing structures shall not be considered."

A statute shall be construed to give meaning to all of its provisions. 1 Pa.C.S. §1922(2). If I cross out the words "exclusively as a result of reassessment or change in ratio," Act 146 imposes a revenue cap (*i.e.,* it prohibits any tax that will produce revenue in excess of 105 percent of the prior year's revenue). Since the legislature does not expect courts to cross out words in construing Act 146, I must give meaning to these words. The school district's reading of Act 146 gives meaning to these words; the property owners' reading does not.

In addition, if the legislature intended for taxing bodies within second-class counties to be precluded from receiving property tax revenue in excess of 105 percent of the total amount of property tax revenue received in the preceding year, it would have used the language it had previously used. In a 1975 amendment to the General County Assessment Code at 72 P.S. §5020-402(b), the legislature enacted legislation that placed a limitation on the total amount of taxes that could be levied where there has been a countywide revision of assessment of real property values or a change in the established predetermined ratio. This amendment, which excludes counties of the first and second class, reads as follows:

"(b) Except as to counties of the first and second class, after any county makes a countywide revision of assessment of real property at values based upon an established predetermined ratio as required by law or after any county changes its established predetermined ratio, *each politi-*

*cal subdivision, which hereafter for the first time levies its real estate taxes on that revised assessment or valuation, shall, for the first year, reduce its tax rate, if necessary, for the purpose of having the total amount of taxes levied for that year against the real properties contained in the duplicate for the preceding year, equal, in the case of any taxing district, not more than 10 per centum greater than the total amount it levied on such proper-- ties* the preceding year, notwithstanding the increased valuations of such properties under the revised assessment. For the purpose of determining the total amount of taxes to be levied for said first year, the amount to be levied on newly constructed buildings or structures or on increased valuations based on new improvements made to existing houses need not be considered. The tax rate shall be fixed for that year at a figure which will accomplish this purpose. With the approval of the court of common pleas, upon good cause shown, any such political subdivision may increase the tax rate herein prescribed, notwithstanding the provisions of this subsection." (emphasis added)

The fourth- to eighth-class county assessment law contains an almost identical provision at 72 P.S. §5453.602(b):

"(b) After any county has established and completed, for the entire county, the permanent system of records consisting of tax maps, property record cards and property owner's index as required by section 306 of this Act, and has made its first county assessment of real property or subsequently makes a countywide revision of assessment of real property under that system and at values based upon an established predetermined ratio as required

by this section or when a county changes its established predetermined ratio, each political subdivision, which hereafter for the first time levies its real estate taxes on that first or revised assessment or valuation, shall, for that first year, reduce its tax rate, if necessary, for the purpose of having the total amount of taxes levied for that year against the real properties contained in the duplicate for the preceding year, equal, in the case of a school district, not more than 110 per centum, and in the case of any other taxing district, not more than 105 per centum of the total amount it levied on such properties the preceding year, notwithstanding the increased valuations of such properties under the new assessment system. For the purpose of determining the total amount of taxes to be levied for said first year, the amount to be levied on newly constructed buildings or structures or on increased valuations based on new improvements made to existing houses need not be considered. The tax rate shall be fixed for that year at a figure which will accomplish this purpose. With the approval of the court of common pleas, upon good cause shown, any such political subdivision may increase the tax rate herein prescribed, notwithstanding the provisions of this subsection. No political subdivision shall levy real estate taxes on a countywide revised assessment until it has been completed for the entire county."

Unlike the above legislation, Act 146 does not limit the total amount of taxes that may be levied against real estate. Act 146 only reaches revenues that are "received exclusively as a result of the reassessment or change in ratio." Certain projected school district revenues in excess of 105 percent of its 2000 revenues will not be "received exclusively as a result of the reassessment or

change in ratio." These revenues will be received because the school district increased its taxes.

Plaintiffs rely on case law holding that statutes relating to taxation are to be strictly construed, and in cases of doubt, the construction should be against the taxing authority (see *e.g., In re Estate of Leitham,* 726 A.2d 1116, 1118 (Pa. Commw. 1999)), and on Rule of Statutory Construction 1928(b)(3), 1 Pa.C.S. §1928(b)(3) which provides that all provisions of a statute imposing taxes shall be strictly construed. I am not certain that this Rule of Statutory Construction applies because Act 146 does not confer any power to impose taxes. Even assuming that it does apply, there is no ambiguity because, as I have discussed, this legislation covers only property tax revenue received "exclusively as a result of the reassessment or change in ratio."

Plaintiffs contend that there is legislative history that supports their position. Attached as exhibit F to an affidavit of Ronald A. Magoc, submitted by plaintiffs, is a document dated November 20, 1998 titled, "House of Representatives/Republican Caucus/Bill Summary."

Plaintiffs rely on the preliminary summary of the bill summary which includes the following description of the legislation:

"(2) limit political subdivisions from receiving tax revenues in excess of 105 percent of the preceding year's property tax revenues after a reassessment or change in the predetermined ratio."

I need not decide what weight, if any, should be given to this document because its discussion of this legislation uses the qualifying language "received exclusively as a result of reassessment or ratio change:"

"(2) *Reassessment revenue caps (anti-windfall provision)*: An additional section is added that requires political subdivisions in counties of the second class in the year following a reassessment or change in the predetermined ratio to reduce tax rates so the total amount of property tax revenue received exclusively as a result of the reassessment or ratio change, excluding the amount to be levied on newly constructed buildings or structures or on increased values on new improvements, does not increase more than five percent over the last year's totals. This language is similar to that included in the Code under the Home Rule Charter Article which, for the exception of a few sections, expires upon the swearing-in of the first elected Home Rule official."

This summary also refers to the other legislation described at pages 33 to 35 of this opinion which uses language placing a limit on the amount of revenue that may be collected without approval of court upon good cause shown.

For these reasons, I rule that the school district did not violate Act 146 if its board initially voted to reduce millage to a millage rate that would not produce revenue in 2001 based on its 2001 taxes which exceeds 105 percent of the revenue it received in 2000 from its 2000 real estate taxes.

### B.

I next address plaintiffs' claim that the school board did not use a two-step process in which it initially voted to reduce taxes and thereafter voted to increase taxes.

I agree with plaintiffs that the board vote was not as clear as it could have been. The board conducted a single

vote in which it set millage at 13.92 mills. See Board of Public Education of the School District of Pittsburgh minutes, December 20, 2000 at 112-13. However, the resolution included a statement of estimated revenues which contained the following:

"Real Estate Tax
Tax rate—in mills 59.7 plus increase of 11.94 equals 71.64
  Converted          11.60 plus increase of 2.32 equals 13.92
Estimated collectible during current year
(current and delinquent)                     $153,640,000"

The first converted number is a millage rate (11.60) that, according to the school district, is permitted under Act 146. The second (2.32 mills) is a 20 percent increase. This shows, according to the school district, that by adopting a millage rate of 13.92 mills, the board was voting to increase taxes by 20 percent.

The purpose of Act 146 is to prevent a taxing body from increasing taxes where the public does not know that this is taking place. The cryptic information upon which the board relies does not support a finding that the public knew what was taking place.

However, the 20 or so newspaper articles the school district submitted, describing the proposed budget of the school superintendent, clearly establish that the public understood that the superintendent initially was asking the board to raise taxes by 23.3 percent and that prior to the vote on his proposed budget, he had reduced the tax increase to 20 percent.

The earliest article, which appeared in the *Pittsburgh Post-Gazette* on November 14, 2000 was titled, "Schools propose a 23.3 percent tax hike." A November 22, 2000

article appearing in the *Pittsburgh Tribune-Review* titled, "Superintendent defends plan," states that the superintendent met with the newspaper's editorial board to discuss the district's preliminary 2001 budget which would raise property taxes by 23 percent. An editorial appearing in the December 19, 2000 *Pittsburgh Post-Gazette* titled, "Remedial math," refers to the superintendent's revised budget that calls for a 20 percent property tax increase rather than 23 percent. An editorial in the December 20, 2000 *Pittsburgh Tribune-Review* titled, "The caged bird," states that the latest budget proposal, reducing the property tax increase from 23 percent to 20 percent, is "inconsequential."

When the vote was taken on December 20, 2000, both the public and the members of the school board clearly understood that the board members who voted for the adoption of the budget intended to be voting for a 20 percent tax increase. Since the public understood that the board was intending to raise taxes by 20 percent, a tax increase of 20 percent above 105 percent of the 2000 revenue (plus revenue from new construction and new improvements) does not violate Act 146.

## C.

For the reasons I have discussed in III.A and III.B of this opinion, since the school district voted to increase taxes by 20 percent, the school district was permitted to set a millage that increases its 2001 revenue by 20 percent of the revenue that it could collect under Act 146 if it had not raised taxes.[8] However, if the millage is likely

---

8. The school district and I recognize that the school district was actually voting to increase taxes by 25 percent (excluding new con-

to produce revenue (excluding new construction) of more than 120 percent of 105 percent of its 2000 revenue, the tax violates Act 146.

At the January 29, 2001 hearing, the school district offered school district exhibit 6 to support its position that its millage would produce revenue in 2001 of only 20 percent more than 105 percent of its 2000 revenue (excluding revenue of $6,104,410 which the school district attributed to new construction). According to exhibit 6, the school district's actual revenue in year 2000 will be $117,750,000. After making adjustments for the 5 percent permitted by Act 146 and the 20 percent tax increase, the school district concluded that it was entitled under Act 146 to set taxes that will produce actual revenue of $151,140,000 (which includes new construction). The school district's witnesses testified that the millage it set (13.92 mills) is likely to produce revenue of $151,140,000. In other words, the millage was set in order to comply with Act 146.

For two reasons, I do not accept the school district's Act 146 calculations.

First, the school district based its revenue projections for 2001 on a hypothetical tax base that turned out to be 5.22 percent lower than its actual tax base. Consequently, if the school district's remaining calculations are correct, the school district will actually collect 5.22 percent

---

struction) when it was announcing that the school board members would be voting for a 20 percent increase. The school district did not violate Act 146 by announcing a 20 percent tax increase when it was actually voting to increase taxes by 25 percent because Act 146 permits a 5 percent increase. (The expectations of the voters as to what they should be told is an election issue—not a judicial issue.)

more revenue than the revenue that it said it would collect.

When the school district adopted its budget on December 20, 2000, the tentative tax base (excluding new construction) provided by the county was $12,841,167,711. The school district assumed that the value of the tax base that would be certified by the county ("actual tax base") would be substantially less. In preparing its budget and setting and raising taxes, the school district used a tax base (excluding new construction) of only $12,179,792,656.

The tax base that was certified by the county on January 11, 2001 (excluding $601,414,706 for new construction) was $12,815,287,920 (or only $25,879,791 less than the tentative certification on which the school district based its budget).[9] In other words, the school district's reduction of $661,375,055 from the estimated tax base exceeded the actual reduction by $635,495,264.

While in December 2000 it may have been appropriate for the school district to assume a lesser tax base, once it received a certified tax base that was only $25,879,791 less than the December estimate, under Act 146, the school district was required to recalculate its millage based on the actual tax base. Because the actual tax base was 5.22 percent higher than the tax base on which the budget was based, actual revenues would ex-

9. A January 11, 2001 letter from the director of the Office of Property Assessment of Allegheny County to the school district certified that the value for the year 2001 of real property as it appears in the assessment rolls and taxable by your political subdivision is $13,416,702,626.

ceed budgeted revenues by 5.22 percent unless taxes were reduced by 5.22 percent. Thus, a balanced budget would become a budget with a surplus of 5.22 percent unless, in 2001, the school district spent more than it had budgeted. The school district's director of finance testified that it was appropriate for the school district not to reduce taxes after being advised that the value of the property which it could tax was 5.22 percent higher than the value of the property on which its budget was based. He said that if the reduction did not show up in the form of a reduced tax base, it would show up in 2001 through increased tax refunds made in 2001 as a result of tax appeals. This explanation makes no sense. The school district's anticipated revenue for 2001 already included a deduction from gross revenue of $4,535,167 for "additional appeals allowance." See school district exhibit 6. Also, fundamental accounting principles do not permit a taxing body to hide an anticipated expenditure by omitting this anticipated expenditure from the budget and using an incorrect tax base to generate revenue for this anticipated expenditure.

The following example shows what occurred:

Assume that the law does not permit an income tax that will generate revenue in excess of $1 million. The law provides for the taxing body to use income in the prior year in setting the tax. The taxing body sets taxes at 10 percent because it uses a total earned income of $10 million. The total income for the prior year is, in fact, $11 million. While a budget based on income of $10 million will produce income of $1 million as permitted by law, a budget based on the actual total income

will produce income of $1.1 million (or $100,000 more than the law permits).

Obviously, the tax base that I will use in deciding whether or not the school district's taxes violate Act 146 is the actual tax base of $13,416,702,626 (less new construction).

There is a second major difficulty with the school district's calculations. The school district's figure for actual revenue for the year 2000 included revenue it receives in tax year 2000 (the school district uses the end of February for its tax year) from year 2000 taxes and an additional $2,500,000 received in 2000 for the late payment of taxes imposed in prior years. Its 2001 figures did not include any late payments.

At a meeting with counsel for the school district and counsel for plaintiffs, I directed the school district to prepare a comparison between year 2000 and 2001 that did not consider, for either year, the receipt of money from taxes owed in prior years. I also directed that the comparison be based on the certified tax base of $13,416,702,626 (less new construction of $601,414,706).

In order to comply with Act 146, the revenue that the school district is likely to receive in 2001 from its 2001 taxes (excluding new construction) may not exceed $145,215,000. The following calculations support this statement:

School district's 2000 revenue from its 2000 taxes:

$115,250,000

Under Act 146, the school district may increase this revenue by five percent without raising taxes:

$121,012,500

The school district can collect 20 percent additional revenue because it voted to raise its taxes by 20 percent:

$145,215,000

I now calculate the revenue that the school district is likely to receive in 2001 from its 2001 taxes at 13.92 mills.

The school district's tax base is $13,416,702,626. The school district will receive $186,760,500 if it collects 100 percent of the taxes which it has imposed:

$186,760,500

Under Act 146, the school district may deduct anticipated revenue from new construction which is the following amount according to school district exhibit 6:

$ 6,104,410

$180,656,090

The school district anticipates refunds of $5,200,000. I will permit this deduction while requiring that it be included as a budget item that cannot be used for other purposes. See my discussion of the county's deduction for refunds at page 27 of this opinion:

$175,456,090

The school district is using a collection rate of 87.5 percent. This is slightly lower than its collection rate for 2000. However, the school district's collection rates have been dropping. Consequently, I will permit the use of this collection rate while creating an escrow fund for increased revenue similar to the trust fund which the city created. If I use this 87.5 percent collection rate, the school district's anticipated revenue (excluding new con-

struction) at a millage rate of 13.92 mills is $153,524,079. This anticipated revenue exceeds the revenue permitted under Act 146 ($145,215,000) by $8,309,079. Consequently, the current millage exceeds the maximum millage permitted by Act 146 and must be reduced to 13.22 mills.[10]

Because the millage deduction that I am requiring is based primarily on the school district's use of the wrong tax base, this millage reduction would not appear to result in the school district's receiving less money from real estate than the amount which it budgeted. The school district's 2001 budget listed revenue of $153,640,000 under the category of real estate tax. This category was described as including "estimated collectible during current year (current and delinquent)." The millage reduction to 13.22 mills in order for the school district to comply with Act 146 would appear to permit the school district to collect real estate revenues of $153,640,000 for 2001, as budgeted.

Under the school district's budget adjustments (87.5 percent collection rate and $5.2 million for refunds), the school district's revenues for 2001 taxes collected in 2001 will be approximately $145,300,000. According to the school district, additional revenue for new construction will be more than $6,000,000. I assume that the pay-

---

10. A millage of 13.22 will produce revenue of $177,368,808 if all taxes are collected (.01322 x tax base of $13,416,702,626). I deduct $6,104,410 for revenues from new construction and $5,200,000 for refunds, leaving a balance of $166,064,398. Using a collection rate of 87.5 percent, the school district will collect 87.5 percent of $166,064,398 or $145,306,348 which slightly exceeds the total amount of $145,215,000 that Act 146 permits.

ments of delinquent taxes in 2001 will be similar to the $2.5 million payments in 2000:

$$\begin{array}{r} \$145,300,000 \\ 6,000,000 \\ 2,500,000 \\ \hline \$153,800,000 \end{array}$$

For plaintiffs' Act 146 challenges to the school district's taxes, I enter the third order of court attached to this opinion.

## ORDER OF COURT—ALLEGHENY COUNTY

On February 5, 2001, it is ordered, adjudged, and decreed that:

(1) Any unspent money in the year 2001 budget item for refunds of $9,702,000 shall not be used for any other purpose in year 2001, any positive balance in this budget item at the end of tax year 2001 shall be available for year 2002 only for this purpose of refunds, and any budget item in year 2002 for refunds shall reflect this balance; and

(2) The county's 2001 tax millage rate does not violate Act 146 or similar provisions in the Home Rule Charter of Allegheny County and its Administrative Code.

---

## ORDER OF COURT—CITY OF PITTSBURGH

On February 5, 2001, it is ordered, adjudged, and decreed that:

(1) The City of Pittsburgh will not modify the provision in its budget documents which provides for a taxpayers rebate and appeals trust fund;

(2) Any revenues (excluding new construction) that the city receives in 2001 from its 2001 real estate taxes which exceed 105 percent of $110,998,081 shall be placed in the trust fund. The 2000 revenue receipts of $110,998,081 may be revised as described in the opinion which accompanies this order of court;

(3) Any revenue in the trust fund at the end of 2001 will, at the discretion of the taxing body, (1) be credited to taxpayers, (2) be refunded to taxpayers, or (3) be treated as 2002 revenues from 2002 real estate taxes, with the millage used in 2001 to be reduced accordingly in year 2002 (without prejudice to the city to thereafter raise millage, at an announced and voted on tax increase);

(4) Revenues received in 2001 in the amount of $3,271,696 (see city exhibit A) may be attributed to new construction; and

(5) The City of Pittsburgh's 2001 millage (if not increased) does not violate Act 146.

---

## ORDER OF COURT—PITTSBURGH SCHOOL DISTRICT

On February 5, 2001, it is ordered, adjudged, and decreed that:

(1) The 2001 tax millage of the Pittsburgh School District is reduced from 13.92 mills to 13.22 mills;

(2) The adjustment to gross revenue submitted by the school district for refunds of $5,200,000 shall be a budget item that will not be used for any other purpose in year 2001. Any positive balance in this budget item at the end of tax year 2001 shall be available for year 2002 only for this purpose of refunds and any budget item in year 2002 for refunds shall reflect this balance;

(3) Any revenues (excluding revenues attributable to new construction) that the school district receives in 2001 from its 2001 real estate taxes which exceed $145,215,000 shall be placed in a separate fund. Revenue in this separate fund may be used in year 2001 to pay refunds which exceed $5,200,000 (see paragraph (2)). The revenue may not be used for any other purpose in 2001. Any revenue in this fund at the end of 2001 will be treated as 2002 revenue from 2002 real estate taxes with the millage used in 2001 to be reduced accordingly in year 2002 (without prejudice to the school district to thereafter raise millage in 2002 at an announced and voted on tax increase); and

(4) Revenues received in 2001 in the amount of $6,104,410 may be attributed to new construction.

---

## ORDER

On February 5, 2001, it is ordered, adjudged, and decreed that this court will continue to exercise jurisdiction over this lawsuit and the implementation of its orders of court.